### Richmond

INSURANCE COMPANY OF NORTH AMERICA, ET AL.

V.

ALFRED E. ABIOUNESS, ET AL., ETC.

Record No. 810485.

March 9, 1984.

Present: All the Justices.

*Robert L. Mills (Allan S. Reynolds; Reynolds, Smith & Winters,* on briefs), for appellants.

*Linda Laibstain (H. David Embree; John A. Heilig; Hoffheimer, Nusbaum, McPhaul & Brenner; Rixey, Heilig & McKenry,* on brief), for appellees.

CARRICO, C.J., delivered the opinion of the Court.

This litigation commenced when Alfred E. Abiouness and others, partners trading as Harbour Gate Associates (Associates), filed in the court below a bill of complaint against Insurance Company of North America (INA) and Royal Globe Insurance Company (Royal Globe). In the bill, Associates alleged that it was the insured under two policies of liability insurance issued by INA and one issued by Royal Globe. Associates sought a determination that the insurers were liable for damages Associates had paid or might be required to pay as a result of defects in a condominium project in which it had sold residential units to various purchasers.

INA and Royal Globe filed a joint answer. They denied that they were liable under the policies, and they alleged that, in derogation of their rights of subrogation, Associates had released the general contractor responsible for the defects in the condominium project, thereby voiding coverage and liability under the policies.

The trial court heard the matter on a stipulation of facts. The court entered judgment in favor of Associates against INA and Royal Globe for the amounts Associates had already paid in settlement of claims brought for defects in the condominium building. The court also ordered the insurers to defend Associates in any pending or future claims and to pay "any liabilities" that might result therefrom. Concerning the insurers' allegation that Associates' release of the general contractor had voided coverage, the court found that the release agreement "did not affect the obligations of the [insurers] pursuant to [their] insurance policies."

The record shows that Associates owned a parcel of land in the City of Virginia Beach and on September 25, 1973, entered into a contract with Max Berg Construction Company for the erection on the parcel of a highrise residential condominium. Berg did not perform the actual work but entered into a subcontract with Joseph S. Floyd Corporation whereby Floyd undertook the performance of all Berg's obligations under its contract with Associates.

Associates purchased the first of the three insurance policies in question on or before September 23, 1973. This policy, issued by INA, covered a term expiring April 10, 1974. The second, also an INA policy, was effective from April 10, 1974, to April 10, 1976. The third, a Royal Globe policy, was in effect from April 10, 1976, to April 10, 1979.

Construction of the condominium was substantially completed about December 1, 1975. During and after the construction period, Associates offered the residential units for sale, making its first conveyance in the early part of 1976.

After the condominium building was completed, damage occurred in residential units and common elements as a result of water leakage during periods of heavy rainfall. The leaks were reported to Associates, but despite its efforts to correct the situation, the structure continued to "suffer water leakage at various times."

On February 9, 1977, Associates entered into a "Release Agreement" with Floyd and the bonding company which had issued performance and payment bonds naming Floyd as principal and Associates as obligee. For the sum of $45,000 paid by the

bonding company, Associates convenanted not to sue Floyd for "any matter whatsoever, past, present, or future, known or unknown, arising out of Floyd's performance or non-performance under the . . . Subcontract between [Floyd] and Berg."

Associates made the last of its conveyances of residential units about August 31, 1978. Between September and November, 1978, Associates settled four of five claims which were included in an action brought by individual unit owners for damages resulting from water leakage; the fifth claim was still pending at the time of trial of the present proceeding. The damage in all five instances originated in 1976, the earliest damage occurring in February of that year.

In September, 1979, Harbour Gate Owners' Association, Inc., brought an action against Associates seeking to recover damages of $200,000 for "initial construction defects in the common elements" of the condominium building. In December, 1979, the Owners' Association brought another action against Associates seeking damages of $77,595 "on account of alleged defects in the roof of the condominium." Both these actions sounded in negligence and breach of warranty and were pending at time of trial of the present proceeding. When INA and Royal Globe were notified of the various claims asserted against Associates, both insurers denied coverage.

While INA and Royal Globe contend that the policies involved in this litigation do not apply to claims for defects in the condominium building, they argue alternatively that "[i]n any event, the release of the general contractor responsible for such defects destroyed the subrogation rights of the insurers and discharged any liability under the policies." This argument, of course, assumes, without admitting, that the insurance policies in question do apply to defects in the condominium building. We will make the same assumption for the purposes of this discussion and consider only the release question.

All three policies involved in this litigation contain the following provision:

> In the event of any payment under this policy, the Company shall be subrogated to all the Insured's rights of recovery therefor against any person or organization and the Insured shall execute and deliver instruments and papers and do

whatever else is necessary to secure such rights. The Insured shall do nothing after loss to prejudice such rights.

Citing this policy language and Code § 38.1-31.2,* Associates equates "loss" with "payment." It argues that the policy prohibits only prejudicial conduct after loss, that loss does not occur and a right of subrogation does not arise until after an insurer makes payment to an insured, and, hence, that the policy prohibits prejudicial conduct only after such payment. Associates concludes that, because no loss had been paid by or even reported to INA and Royal Globe at the time the release agreement was signed, the execution of the agreement did not violate the insurers' subrogation rights.

During oral argument, Associates shifted its position somewhat. It argued that "loss occurs at the time [Associates] pays money out to the condominium owners who complain" and that, since it paid no claims until after the release agreement was executed, it did not violate the insurers' subrogation rights.

We reject both of Associates' arguments. We would agree that an insurer cannot *enforce* subrogation rights until after it has made payment under a policy; this is one of the lessons learned from Code § 38.1-31.2. We do not agree, however, that loss occurs only after payment by the insurer to the insured or by the insured to a third party whose claim might be covered under the policy. We believe that, in the context of the policy provision in question, loss occurs when an insured risk causes damage.

As noted previously, we have assumed for the purposes of this discussion that the risk insured against in this case was defective construction. Hence, if construction defects existed and caused damage before the release agreement was signed, and if the agreement released a person or entity allegedly responsible for the damage, then the subrogation rights of the insurers would have been prejudiced and Associates would be barred from recovery under the policies in question. *See* 16 G. Couch, *Cyclopedia of Insurance Law* § 61:197 (rev. 2d ed. 1983).

---

* § 38.1-31.2. *Enforcement of right of subrogation in name of assured.* — When any insurance company makes payment to an assured under any contract of insurance, except contracts or plans to which the provisions of § 38.1-342.2 are applicable, which contract of insurance provides that the company becomes subrogated to the rights of the assured against any other party or parties, such company may enforce, in its own name or in the name of the assured or his personal representative, the legal liability of such other party.

We believe the record establishes clearly that construction defects did exist and did cause damage before the release agreement was executed. The agreement itself recited that "various disputes [had] arisen between [Associates] and Floyd in the course of completion of the project which could give rise to costly and burdensome litigation were a compromise not effected."

This recital obviously relates to the fact that, from the time the condominium building was completed and before the release agreement was executed on February 9, 1977, water leakage had occurred in the building and caused damage. Indeed, the four claims Associates settled with individual unit owners were for water damage originating during 1976, two of the claims involving damage occurring as early as February, 1976, only two months after the building was completed and a whole year before the release agreement was executed. The incidents of water leakage were reported to Associates, and it undertook "through various contractors, subcontractors, and other experts . . . to stop such leaks."

Associates admits it knew there were "problems" with water leakage at the time it executed the release agreement, but it attempts to explain away the agreement by saying "there was simply not the knowledge of the extent of these problems." But this explanation only demonstrates that Associates may have made a bad business decision in executing the release agreement. Regardless, the facts remain that at the time the release agreement was executed, a loss had occurred and in the agreement Associates covenanted not to sue Floyd "for any matter whatsoever, past, present, or future, known or unknown." This language relieved from liability a party allegedly responsible for the loss, to whatever extent the loss might multiply, all to the prejudice of the subrogation rights of INA and Royal Globe.

Accordingly, we will reverse the judgment of the trial court in all respects and enter final judgment here declaring that INA and Royal Globe are not liable to Associates under any of the three policies in question.

*Reversed and final judgment.*